IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

    Chhatrala Grand Rapids, LLC

           Chapter 11 Proceeding
           Case No. 19-03908-jtg

    Debtor.

**BRIEF IN SUPPORT OF RECEIVER'S MOTION TO EXCUSE COMPLIANCE
WITH 11 USC §543(d)(1)**

Amicus Management, Inc. (the "Receiver") as receiver of the real and personal property located at 5700 28th Street, SE, Grand Rapids, Michigan 49546 and all membership interests and voting rights of Debtor (the "Property"), respectfully submits this brief in support of its Motion to Excuse Compliance with 11 USC §543(d)(1) (the "Motion"). For the reasons set forth below, the Court should grant the Receiver's Motion.

**PRELIMINARY STATEMENT**

Chhatrala Grand Rapids, LLC (the "Debtor") has filed this Chapter 11 case for the sole purpose of halting a state court action that exposed the Debtor's mismanagement of the Property, necessitating the appointment of the Receiver. (Exhibit A, Temporary *Ex Parte* Order Appointing Receiver, which was extended through September 17, 2019).

All relevant factors support granting the Receiver's Motion: (1) the Debtor is insolvent; (2) there is no likelihood of reorganization, as the Chapter 11 filing was unauthorized; and (3) there are numerous instances of mismanagement by the Debtor. These circumstances, as more fully described below, unquestionably demonstrate that excusing the Receiver will better serve the interests of creditors.

Michigan law imposes a number of duties on court-appointed receivers, including "the duty of administering the assets of the receivership for the benefit of all of that estate's

creditors." *Bogrette v. Young*, 132 Mich. App. 431, 434 (1984). Similarly, the standard for excusing a receiver from the requirements of § 543(a) and (b) is that the "interests of creditors…would be better served" by such excusal. 11 U.S.C. §543(d). In an effort to satisfy its duties to the creditors, the Receiver seeks excusal from turnover.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are set forth in Access Point Financial, LLC's Verified Complaint and Verified Motion for Appointment of Receiver, copies of which are attached as Exhibit B and C respectively:

*Access Point Financial Notes and Mortgage.*

On October 10, 2017, Debtor entered into two promissory notes with a combined indebtedness of $15,000,000.00 ("Promissory Notes") with Access Point Financial, LLC ("Access Point") on (Ex. 1 to Verified Complaint). The Promissory Notes are secured by a first priority mortgage on 5700 28th Street SE, Grand Rapids Michigan 49546 ("Mortgage") (Ex. 2 to Verified Complaint) and a Pledge Agreement of all membership and voting interests in Debtor. Access Point perfected this Pledge with a filing with the State of California. See Exhibits D & E. Defendants Surinder Bhogal and Bhavneet Bhogal ("Guarantors") guaranteed the repayment of the indebtedness under the Promissory Notes (Ex. 3 to Verified Complaint). The indebtedness is also secured by an Equipment Loan Security Agreement dated October 10, 2019 ("Security Agreement") and Assignment of Leases and Rents ("Assignment of Rents") (Ex. 4 to Verified Complaint). The Promissory Notes, Mortgage, Guarantees, Security Agreement and Assignment of Rents are collectively referred to herein as "Loan Documents". Access Point properly perfected its collateral security interest by filing a UCC-1 financing statement (Ex. 5 to Verified Complaint).

Debtor failed to make its May through August payments. Access Point accelerated its indebtedness and triggered its rights under the Loan Documents by sending the Notice of Default and Acceleration on July 23, 2019. (Ex. 7 to Verified Complaint). <u>Within days of receiving that letter, Debtor transferred $80,000.00 out of the hotel operating account on July 29, 2019</u>. (Ex. 8 of Verified Complaint at ¶14, 15).

*Shiva Management Note and Mortgage.*

Debtor also entered into a Secured Promissory Note and Mortgage with Shiva Management, LLC ("Shiva Management") on October 10, 2017 ("Shiva Note and Mortgage"). (Ex. 8 to Verified Motion). Shiva Management is owed $2,088,027.40 pursuant to the Shiva Note and Mortgage and is the perfected second position mortgagee. Debtor is in default of the Shiva Note and Mortgage by, among other things, failing to pay Shiva Management and as a result initiated foreclosure by advertisement proceedings. (Ex. 9 to Verified Motion).

Subsequent to Shiva Management's institution of the foreclosure proceedings, it learned that the Debtor, through its principal Surinder Bhogal, was apparently dissipating, mismanaging, and misappropriating hotel revenue for his own benefit to the detriment of Shiva Management and other creditors. Shiva Management also subsequently learned that the Debtor was also in default of its obligations to Access Point. This caused even greater concern for Shiva Management because July and August hotel revenue is historically robust and should have been more than sufficient to service the debts of both Access Point and Shiva Management. Accordingly, it became obvious that Debtor was mismanaging the hotel and/or diverting revenue to the detriment of creditors.

In light of the new information received, Shiva Management suspended its foreclosure proceedings because foreclosure would still allow the Debtor to control the

3

hotel and continue to dissipate, mismanage and misappropriate hotel assets. Instead, it became apparent that appointment of a Receiver was the appropriate remedy to undertake. (See Ex.10 to Verified Motion-Affidavit of Hemant Chhatrala).

*Access Point Financial and Shiva Management Jointly Exercise Receivership Remedy.*

Access Point and Shiva Management jointly sought the appointment of a receiver consistent with the rights and remedies granted to them in the Loan Documents, the Shiva Note and Mortgage and pursuant to the Uniform Commercial Real Estate Receivership Act MCL §554.1011 *et. seq.* over the real property subject to mortgage interests, and the business assets of Debtor.

On August 22, 2019, Kent County Circuit Court Judge Yates, issued a Temporary *Ex Parte* Order Appointing Receiver. Amicus Management, Inc. was appointed receiver of the Property. As set forth in the Temporary *Ex Parte* Order Appointing Receiver, following a review of the Verified Complaint and Verified Motion, the Court found that Access Point and Shiva Management demonstrated the likelihood of injury, loss or damage to the Property as a result of the transfer or dissipation of funds from the Property's revenue by the owner's past and recent actions with respect to the operational revenue.

*Financial Documents of Debtor*

As set forth in Exhibit 8 to the Verified Complaint (Exhibit B), Access Point obtained copies of the financial documents for Debtor. The financial documents reveal Debtor has failed to transfer sufficient funds from the hotel revenue account, held with Bank of America, to its operational account for the Crown Plaza Hotel, held with PNC Bank. The failure to do so has caused aging accounts payable in an amount in excess of $650,000.00 subjecting the Crown Plaza Hotel to recent utility shut off notices and insurance cancelation

warnings.  In addition, Debtor has failed to make its tax escrow payments and it has a $0.00 tax escrow balance with $125,967.67 in real estate taxes that became due on September 14, 2019.  To date, these remain unpaid.  This outstanding amount is included in the $650,000.00 figure recited above.  There are also $49,000.00 in personal property taxes due and unpaid.

Within days of Access Point's notice of acceleration of its indebtedness, Debtor transferred $80,000.00 from the hotel revenue account to another unknown savings account. The documents also reveal that hotel revenue has been diverted to pay for the down payment on a luxury car in California and private school tuition.

Debtor remains in default of its loan obligations to Access Point and Shiva Management while diverting portions of the revenue from the hotel operations for personal use.  Judge Yates, in his Temporary *Ex Pate* Order Appointing Receiver, ordered that the Debtor, all of its shareholders and/or members, all property managers, all tenants and occupants of any of the Property, all those in active participation or concert with one of the foregoing who receive notice of the Order, and all others who receive notice of this Order, are enjoined from, and shall not:

i. Commit Waste. Commit or permit any waste on all or any part of the Receivership Property, or suffer or commit or permit any act on all or any part of the Receivership Property in violation of law, or remove, transfer, encumber or otherwise dispose of any of the Property;

ii. Collect Income. Demand, collect, receive, discount, or in any other way divert or use any Income;

iii. Terminate any Utility Service. Terminate or withhold any electric, gas, water, sewer, telephone or other utility service supplying the Property, require any utility deposit or otherwise interfere with the continued operations of the Property;

iv. Interfere with the Receiver. Directly or indirectly interfere in any manner

5

        with the discharge of the Receiver's duties under this Order;

v.       Transfer or Encumber the Property. Expend, disburse, transfer, assign, sell, convey, devise, pledge, mortgage, create a security interest in, encumber, conceal or in any manner whatsoever deal in or dispose of the whole or any part of the Property, including, but not limited to, the Income without prior Court order;

vi.      Impair the Preservation of the Property. Do any act which will, or which will tend to impair, defeat, divert, prevent or prejudice the preservation of the Property, including the Income, or the preservation of Plaintiffs interest in the Property and the Income.

vii.     Conduct Shareholder or Member Meetings. Call or conduct any shareholder meeting, member meeting, or board meeting for purposes of voting on company actions or resolutions without the prior express written consent of the Receiver.

viii.    Electronic Information. Destroy or delete any electronically stored information, data, transmissions and records pertaining in any manner to the Business and/or the Company.

However, on the date set for the hearing to extend the Temporary *Ex Parte* Order Appointing Receiver (September 16, 2019), Debtor, despite having assigned all of its member and voting interests to Access Point which became operative upon the event of default with Access Point, despite dissolving the entity in February of 2019, and despite the *Ex Parte* Order granting all those rights to the Receiver, filed for Chapter 11 bankruptcy solely in an effort to halt the ongoing state court action.

## LAW AND ARGUMENT

Generally, upon learning of the commencement of a bankruptcy proceeding, a custodian is required to turn over all of the debtor's assets except as is necessary to preserve such property. *See* 11 U.S.C. § 543 (a) and (b). Receivers under state law are "custodians" within the meaning of Bankruptcy Code § 543. *See* 11 U.S.C. § 101(11)(A). However, the Bankruptcy Code also provides a broad exception to the Section 543(b) turn

over requirement. *See* 11 U.S.C. § 543(d). After notice and a hearing, a bankruptcy Court may continue the receivership and excuse the receiver from Section 543(b)'s turnover requirement. In determining whether to excuse turnover, bankruptcy courts consider the following factors: (1) the likelihood of reorganization, (2) the probability that funds required for reorganization will be available and (3) whether there were instances of mismanagement by the debtor. *In re Willowood East Apartments of Indianapolis II, Ltd.*, 117 B.R. 320, 322 (Bankr. S.D. Ohio 1990); *In re California Gardens Apartments, Ltd.*, 130 B.R. 509, 516 (Bankr. S.D. Ohio 1991).

Section 543(d)(1) provides that the Bankruptcy Court "may excuse [turnover] if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting the [Receiver] to continue in possession...." In other words, where the debtor is insolvent, the question is whether continued possession by the Receiver, or alternatively turnover back to the Debtor, would better serve the interests of creditors. The interests of equity security holders are considered only if the debtor is solvent. As is more fully stated below, the Debtor in this case is insolvent, and therefore the sole consideration is the interests of creditors.

When determining whether to excuse the custodian from turning over the assets, the Court examines the following factors:

    i.    whether there will be sufficient income to fund a successful reorganization;

    ii.    whether the debtor will use the turnover property for the benefit of the creditors;

    iii.    whether there has been mismanagement by the debtor;

7

      iv.        whether or not there are avoidance issues raised with respect to property retained by a receiver, because a receiver does not possess avoiding powers for the benefit of the estate; and

      v.        the fact that the bankruptcy automatic stay has deactivated the state court receivership action.

*In re Dill,* 163 BR 221, 225 (E.D.NY 1994); see also *In re Packard Square LLC,* 575 B.R. 768, 780 (Bankr. E.D. Mich. 2017).

"The interests of the debtor… are not part of the criteria considered when applying section 543(d)(1)." *In re Dill,* 163 BR at 225. Where it will better serve creditors, bankruptcy courts regularly excuse custodians from the turnover requirements of 543. *See In re LCL Income Props., L.P. VI*, 177 B.R. 872, (Bankr. S.D. Ohio 1995) (granting motion to excuse turn over, even though there was no showing of mismanagement, where the receivership did not appear detrimental to the debtor's ability to reorganize, and in the event a reorganization failed the reinstallment of the receiver would cause unnecessary trouble and expense); *Plihal v. Austin Co. (In re Plihal)*, 97 B.R. 561 (Bankr. D. Neb. 1989) (holding that excusal from turnover was in the best interests of creditors where the debtor lacked funds to reorganize); *In re Sundance Corp.*, 83 B.R. 746 (Bankr. D. Mont. 1988) (excusing receiver from turnover where the debtor's ability to fund its business operations were questionable and the receiver had ably performed its duties); *See also Foundry of Barrington P'Ship v. Barrett (In re Foundry of Barrington P'Ship)*, 129 B.R. 550 (Bankr. N.D. Ill. 1991) (excusing receiver from turnover where there was no equity in property for unsecured creditors, largest secured creditor preferred to have the receiver remain in place, and the debtor's prospects for reorganization were speculative).

    In the present case, the Receiver should be excused from turnover because it is in the best interests of creditors.

I. <u>The Debtor is insolvent</u>

Under the Bankruptcy Code, "insolvent" means the sum of an entity's debts is greater than the fair value of all the entity's property. *See* 11 U.S.C. § 101(32)(A). A "debt" means "liability on a claim." 11 U.S.C. §101(12). The term "claim" is, in turn, defined broadly, *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991), and includes a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. §101(5). Therefore, for purposes of determining insolvency, the amount of the Debtor's debts includes any debt which the Debtor has guaranteed.

The Receiver has reviewed the budget of the Debtor. While the Debtor's acting budget shows net profits in some months, the budget does not account for the payment of any debt service to either of the secured creditors. Debtor presently has in excess of $650,000.00 in account payables. *See* Exhibit F. The Debtor is insolvent because the sum of its debts is greater than the fair value of their property. Therefore, the Debtor in this case is insolvent, and the only relevant consideration in determining whether to excuse the Receiver from the turnover requirements of § 543 is whether excusal will better serve the interests of creditors.

II. <u>There is no likelihood of reorganization</u>

There is no likelihood of reorganization, as the Debtor's Chapter 11 filing was unauthorized. As a part of the collateral pledged for the loans to Access Point, Surinder Bhogal, granted Access Point a security interest in all of his membership interest in the Debtor[1], a copy of which is attached as Exhibit D. Paragraph 1 of the Pledge Agreement

---

[1] Surinder Bohgal was the sole member of Debtor.

9

provides that the "Beneficial ownership of the Membership Interest, including without limitation, all voting, consensual and dividend rights, shall remain in Guarantor [Surinder Bhogal] until the occurrence of an Event of Default. Following the default and notice of acceleration, Access Point sought a receiver to take possession of its Collateral. The Temporary *Ex Parte* Order Appointing Receiver provided in paragraph 2(d) that the Receiver shall "have the sole and exclusive authority to act for and in the name of entity Defendant [Debtor]." The Order further provides that "The Receiver shall have sole authority to exercise the voting rights of the member interests or stock of the Defendant, and shall have sole authority to perform any act on behalf of the Defendant [Debtor]." As such, the Debtor had no authority to file the Chapter 11, as the Receiver was in possession of the member and voting interests of the Debtor. *See Commodity Futures Trading Comn v FITC, Inc.,* 52 BR 935 (N.D. Cal. 1985) ("Once a court appoints a receiver, the management loses the power to run the corporation's affairs. The receiver obtains all the corporation's power and assets. Thus it was the receiver, and only the receiver, who this court empowered with the authority to place FITC in bankruptcy."). Thus, there is no likelihood of reorganization, as the filing was unauthorized and the petition should be dismissed.

Moreover, it is evident the Debtor does not seek a genuine reorganization, as it formally dissolved the Debtor back in February of 2019. *See* Exhibit G. For those reasons, there is no likelihood of reorganization.

III. Mismanagement by Debtor.

As set forth above, and as provided for in the Affidavit attached hereto, the Debtor has engaged in mismanagement of the Property. The documents on file in the circuit court action reveal Debtor has failed to transfer sufficient funds from the hotel revenue account

to its operational account for the Crown Plaza Hotel. Instead, Debtor, through its principal Surinder Bhogal, has dissipated and misappropriated hotel revenue for his own benefit to the detriment of Access Point and other creditors.

Debtor's actions have caused aging accounts payable in an amount in excess of $650,000.00 subjecting the Crown Plaza Hotel to recent utility shut off notices and insurance cancelation warnings.  In addition, Debtor is committing waste by failing to pay its real estate and personal property taxes.  Debtor has further committed waste by failing to maintain the property in accordance with its required property improvement plan ("PIP") with InterContinental Hotels Group (IHG) and is in jeopardy of losing its flag (Exhibit H).  The cost of the PIP plan is believed to be in the range of $14,000,000.00 (See Exhibit I).  Debtor will face significant penalties, including potential termination of the flag if they fail to commence the PIP by November 14, 2019.  Furthermore, Debtor recently lost an airline contract as a result of the condition of the property and one because the airline did not want to stay at the property during the renovations that are needed, which is adversely impact the bottom line.

The Receiver has also discovered that, in violation of the liquor license and special permits issued by the Michigan Liquor Control Commission, Debtor has been using a different entity, Bhogal Enterprises, LLC to buy and sell alcohol spirits and is taking payments for such in the name of Bhogal.  This could result in a suspension and/or loss of the liquor license(s) at the Property. *See* Exhibit F.

The Bhogals have commingled funds, using hotel receipts and other income generated from the operations of the hotel for personal expenses instead of paying accounts payables, debt service and/or property taxes.  For example, they have written

checks from the business accounts of the Debtor to pay a $30,000.00 down payment to a luxury car dealership in Newport Beach, California and recently paid education expenses out of the business accounts in amounts in excess of $3,000.00 an $5,000.00.  *See* Exhibit F.

The instances of mismanagement described above support excusing the Receiver from turnover pursuant to § 543(d).

**CONCLUSION**

In light of the above, the Receiver requests that this Honorable Court grant its Motion excusing it from the turnover requirement pursuant to § 543(d), authorize the Receiver to continue operating under the State court Receivership Order, and provide such other and further relief as the Court deems just and equitable.

Dated:  September 17, 2019                    Respectfully submitted,
                                              PLUNKETT COONEY

                                              By:  *Kelli L. Baker*
                                              Kelli L. Baker (P49960)
                                              Lisa A. Hall (P70200)
                                              Attorney for Amicus Management, Inc., in its capacity as state court receiver
                                              333 Bridge Street, Ste. 530
                                              Grand Rapids, MI  49504
                                              (616)  752-4600

Open.25946.93442.22811271-1